First case for argument this afternoon is case number 19-2721, Western, MO, John Zimmerli et al. v. The City of Kansas City, MO. Thank you. We're ready to begin. Thank you, Your Honors. And may it please the Court, I'm Jonathan Sternberg, and I represent the plaintiffs, who are two classes of emergency service personnel employees of the City of Kansas, and some are fire medics. The plaintiffs appeal from a summary judgment in the City's favor on their overtime compensation claims under the Fair Labor Standards Act, which held that first, that the pay scheme that the City negotiated with the Static Paramedics Union after having been found in violation of the Fair Labor Standards Act back in the Hermsen case by not paying them overtime now satisfied the Act, and second, that the City's fire medics assigned to ambulances were exempt under Section 207K of the Act as employees engaged in fire protection. Your Honors, both holdings were error. This Court should reverse the District Court's judgment and should remand this case for judgment in the plaintiffs' favor on both claims. And I'd like to start by addressing the City's pay scheme for static paramedics. The City's post-Hermsen scheme for paying static paramedics does not pay them overtime compensation in compliance with the Fair Labor Standards Act. Instead, having been caught red-handed in the Hermsen case not paying them overtime, which they did in court's decision in the 149 Madison case all the way back in 1947, and as another authority we cite, the City unlawfully is attempting to avoid the required increased labor costs associated with overtime by artificially lowering their regular rate of pay so that their pay remains the same now as it did before the Hermsen case. The Court should follow the Fair Labor Standards Act, follow 149 Madison and its progeny, and put a stop to this. Section 207A of the Fair Labor Standards Act is well known. It requires time and a half pay for any hours that an employee works over 40 hours a week. And since the very beginning of the Act, back in the 1930s and 1940s, it's been universally held that an employer violating the Act by not paying its employees overtime cannot then satisfy the Act by back-ending in overtime pay to the previous pay, even if the employees or their union agree to this. And that's the 149 Madison case from the Supreme Court, again back in 1947, which affirmed the Second Circuit, and that involved a union's agreement to do this. And it's also the Greenhead case from the Tenth Circuit in 1943, which we discussed in our opening brief, although the City has no response to at all, doesn't even mention, which involved agreements with the employees themselves. What that does is exactly what the Department of Labor's regulations implementing the Fair Labor Standards Act prohibit, specifically in 29 CFR 778.500, by setting an arbitrarily low regular hourly rate on which to compute the time and a half rate to achieve a desired result. Basically, it says what we want the pay to be first, and then figures out what part of that they want to call overtime. Council, as long as the City complies with the FLSA, why does it matter whether they back in themselves, or on the back end, figure out how to make it budget neutral? And I'm not sure the calculation is right. That's a different issue, that the calculation in the agreement or the side letter is right. But what prevents the union and the City from agreeing on something, and it just so happens that the firemen end up, and the paramedics end up with the same pay? The regulations themselves implementing the FLSA prohibit that. That is universally prohibited, specifically by 778.109, and for salaried employees, because that's what we're talking about here, of course, for salaried employees, 778.113. 778.113 says if you're going to have a salaried employee and figure out how their pay is going to be calculated under the Fair Labor Standards Act, you take that, so it's a monthly salary here, and that's the example that the regulation uses too. You take the monthly salary, you multiply it by 12 to find out what the annual salary would be. You divide that by 52, and that gets you what the 40 hours a week would be, and you get a 40 hour a week hourly rate from that. And from there, you figure out what the overtime compensation would be. There's a case the City cites, not without any irony, I think, it's the Arron case from the 10th Circuit in 1995, where there, the employer did exactly that. It was a biweekly salary rather than a monthly salary like here, and this is really what the City should have done here. They figured out that, I think they work 112 hours every two weeks, so they divided the biweekly salary by 112 hours, they got an hourly rate, and they figured out which of those hours were overtime, any amount in excess of 40, and were able then to, in addition to the salary, add on the amount that's overtime. And this goes back to, and I think the reason for these regulations, all the way back in 1945, the U.S. Supreme Court, and it's hard to pronounce this one, I think it's the Harnisch-Feger case, we cited in our opening brief, held that a full 50% increase in labor costs and a full 50% wage premium are meant to flow from the operation of 2078. So deciding what you want first, and then going back and saying what part of that is overtime, that violates the regulations because that violates the I hear a real mix of issues in the way you're presenting it. You have the, you shouldn't be able to back into it issue, and then you also have the, and I heard it kind of hinted at, which is that this should have been calculated on a weekly, on weekly wages or weekly pay, and that seems to be the stronger argument, rather than trying to figure out what the intent of the parties here were. But maybe I'm wrong about that. No, that's entirely fair. We argue, we have a chart on page 31 of our brief where I do the calculation that 778.113 would have called for, and it shows, we take one of the monthly salaries in the side letter, and again, there's page 31 of our opening brief, we translate that into the annual salary into the 52 weeks a year, and, sorry, into the 52 weeks out of the year, come up with what the hourly rate should have been, and then what the overtime rate should have been, and that's how they should have been done. Should it be calculated? See, here's one of the difficulties that I had. I ran the calculation, we worked through some various scenarios, and the issue here is they work, I believe they work 48 hours, two weeks, and 72 hours the third week. That's correct. And so you take it on this, I mean, how do you figure it out when you have different hours? I mean, that's why the district court, I think, went annual in the way it did it, because it could figure out the total amount of hours. How do you do it when some weeks are 72 and some weeks are 48? You do it just exactly the way that the regulation, 778.113, says you have to. I mean, the regulations inform the statute. It's not just that they're bound by the statute, they're bound by the regulations as well, and these regulations, 778.113 is expressed in Section B for how an annual salary has to be calculated out in overtime. It doesn't make any difference for employees who work more overtime than others or employees, as here, who only work overtime. I mean, because that's what we're getting at, Your Honor. These are employees who only work overtime, and it's different in different weeks. Regardless, because one of the purposes of the Fair Labor Standards Act is to compensate people for the wear and tear on their bodies and on their lives for working these extra hours, eight hours some weeks, 22 hours, another, I'm sorry, 32 hours another week, it doesn't matter if you have these different staggered weeks. The regulation still requires that we determine what their hourly rate, their 40-hour-a-week rate is, and then pay them above that, and the city's not doing that. In fact, what the city is doing here, they really try hard to get around this. Counsel, before you move on, you said divided by 40. I'm not sure that's right. It's supposed to be the total number of hours per week. So wouldn't you divide by 48 in those weeks in which they're working 48, and 72 in those weeks they're working 72 hours? No, Your Honor. If you look at the regulation itself, 778.113B, you take the monthly salary, you multiply it by 12 to get a yearly salary. You divide that by 52, and then you divide that by 40 to determine what the regular rate of pay is going to be. That's how you translate a salary into a regular rate. It's right there in the regulation. It is not done on the basis of overtime, because otherwise you'd never get any overtime pay. That's the problem. Overtime is supposed to be above and beyond what Congress originally set as the threshold of 40 hours and 207A. But I'm not sure that's how the Fifth Circuit did it. It was an opinion by Judge Garza, and I don't know that I have it sitting in front of me. It was from about 20 years ago, and you may know it off the top of your head, but I think that the Fifth Circuit calculated it the way I suggested. Now, maybe you can tell me that the regulation has changed or whatever, but my understanding is they went through and they divided it by 48 and divided it by 72, although the numbers were different in that case. I'm afraid I have a terrible answer for an appellate lawyer. I don't know the case, Your Honor. Fair enough. It's Singer v. Waco, 324F3R813. But if you're not familiar with it, it's not worth questioning you about it. Thank you, Your Honor. I would point the court to the Aaron case, which I already mentioned from the Tenth Circuit in 1995, where it was calculated for, again, these were firefighters, so they have different pay. It was calculated correctly. What the city's actually done here, though, and they try hard to get around this, is exactly what the employer and the union did in the 149 Madison case way back when. I mean, it's exactly the same. We have a chart or a little comparison box on page 10 of our reply brief, and I'll quote. This is from the Second Circuit's decision that the Supreme Court was affirming. The hourly rates for those regularly employed more than 40 hours a week were determined by dividing their weekly earnings by the number of hours employed plus one-half the number of hours actually employed in excess of 40 to get an hourly rate for hours that they didn't work. I mean, essentially, it wasn't based on the actual hours worked. And then, you know, computed it based on that. That's exactly what the city did here. If you look at pages 9 to 10. Does it matter whether it's unilateral? It's a unilateral decision from the employer as opposed to a negotiated contract like it is here? No, it does not, Your Honor. In fact, in the 149 Madison case, it was a negotiated contract with the union, just as here. And then there's the Greenhead case from the Tenth Circuit back in the 40s as well, which was an agreement with the employees themselves, not through a union. No, that makes no difference. And that's because, you know, in cases we cite in our brief from the 1940s through the Ballantyne case in the 80s, parties cannot contract away their FLSA rights even by collective bargaining. So it makes no difference at all. The city tries to argue that. They try to say that some of our authorities are unilateral, and some are, but some are not. And it makes no difference. What the city has done here is attempted to circumvent the FLSA and by its own admission, paying the employees the same that it did before it was found to have violated the FLSA. Seeing that I'm getting toward my time I'd like to reserve for rebuttal, I want to move on to the second issue, unless the court has other questions on the first issue. That's these fire medics. The district court also erred in concluding that the city's fire medics assigned to ambulances are exempt from overtime pay under Section 207k as employees engaged in fire protection activities. It reasoned that this is because they have the responsibility to engage in fire protection within the meaning of the definitional statute. Your honors, that's just not true. There's no circuit split on this. I want to make that clear. The city got some legal opinion before this case began saying that there was a circuit split on this issue and this court had not yet ruled. That is simply not true. The Lawrence case in the Third Circuit, the Cleveland case in the Ninth Circuit, and the Huff case in the Fifth Circuit all agree that the employee has to have some actual duty, some actual responsibility to fight fires. Well, the only difference between the three cases is in Lawrence and Cleveland they didn't have that responsibility, which we argue is the same as here, but in Huff they did. In Huff they actually were assigned to fight fires and so when they talked about the present forward-looking duty in the Huff case, they meant that it's a duty these people have that going forward they're going to have to engage it. But just as in the Cleveland and Lawrence cases, that's not true here at all. These fire medics who are assigned to ambulances, and the city wants to make this about all fire medics, they're trying to get around their stipulation. It's on page 66 of the appendix, paragraph 45, they said of the fire medics that have joined in this case, that is only the ones in the opt-in class here, for approximately six months each work nearly exclusively on either by direct scheduling or by detail. I want to ask you, because I have to disagree with you, I think there's a circuit split. There may not be a circuit split when you account for the facts of each individual case, but when you account for the reasoning, and even Judge Hardiman said this in his third circuit dissent, he said that there's these courts to look at future, a future duty, and these courts to look at a present duty. So I find it hard to believe that Judge Hardiman has it wrong and that I have it wrong when I read these cases and find that the reasoning does suggest at least a circuit split on that particular point. Judge Strauss, it's not my job to tell you that you're wrong. You're supposed to tell me if I'm right or wrong, but I respectfully have to disagree with both you and Judge Hardiman, and I don't think the way that these, that this is being applied is different between these circuits at all. If the, I think if the fifth circuit were faced with facts like this, with facts like Lawrence, facts like Cleveland, they would have come up with the same thing because just as here, there is no actual forward looking duty for these people to fight fires. They're assigned to ambulances. While they're assigned to ambulances, they are prohibited from even going within 50 feet of a fire. They're disallowed. Can I follow up on your statement that the stipulation is that this is about a six month period of time? I was a bit, I wasn't quite sure what the parties agreed on here, what was undisputed in the stipulation of facts, because there was discussion about, I think even in the, the red brief was there was no work period during which these fire medics did not do both static work and fire suppression work. So can you help me understand what actually is undisputed? What is the stipulation? Certainly. There's a footnote on that where the parties, again, this is written by both the parties and signed by both of them, that determining the exact amount of times individuals are working nearly exclusively on ambulances is unnecessary for purposes of this determination, as it would relate primarily to damages instead of the legal question of whether they're subject to this. And I understand the footnote and sort of the, the idea that this could be a damages issue, but don't we have to look at the first instance to see whether they have the responsibility of fire suppression? And wouldn't you then look at the entire work period of what their responsibilities were during that time? This has been narrowly framed for the court, that is when people are assigned to ambulances, they have no duty to fight fire, they have no ability to fight fires. And the question for the court is whether during that time, when they have that assignment, however long or however short that assignment may be, when they have that assignment, are they exempt or not? And you've been using the word, just a quick question here, you've been saying the responsibility to fight fires, the phrase in the statute is fire suppression, am I right? And is that different than fighting fires? We don't have a definition of fire suppression, but one could envision a world where that sort of is a broader term than firefighting, maybe just because we call them firefighters. And I don't know if I'm finding a distinction where there is none, or whether you find any meaningful distinction there. I don't think there is a meaningful distinction there, I mean, you're right, I'm using firefighting, because that's what we call them, we call them firefighters. But fire suppression is people who are attempting to suppress fires. Now here, I don't think that, at the very least in this case, it's not a distinction that makes a difference, because here, they are disallowed from even going within 50 feet of a fire, they are disallowed from engaging in fire suppression. But they're allowed to go into what's called the warm zone, and I think they pass along ladders, they straighten fire hoses, etc. I think that is disputed, but you could tell me if I'm wrong. And if that's true, I would think that's part of a fire suppression activity. Those are the fire medics who aren't assigned to ambulances, Your Honor. The city is trying to conflate the two, and that's in our requirement. Seeing that I am eating... So it is disputed. I don't think that's disputed. I think the city is trying to tell you that these are different, those are different fire medics. Go off the stipulation. The stipulation is key here. I'd like to preserve the rest of my time for rebuttal. Thank you, Your Honor. Thank you. Counsel? Good afternoon, Your Honors. Cara Kelly for the City of Kansas City. In this case, the district court decided two separate FLSA issues concerning fire department personnel employed by the city. The first was whether the city appropriately compensated static single-role paramedics and EMTs for overtime hours work, and the second was whether the city appropriately treats fire medics as partially exempt under the 207k partial exemption for fire personnel. The answer to both questions, has the district court properly surmised, is yes. The record shows that the city calculates the regular rate for static single-role medical personnel by taking the yearly salary and dividing by the hours for which it is intended to compensate. Because some of those hours are scheduled overtime hours and multiplies those hours by 1.5 to convert them to straight time, this is the formula that was approved both by the Fourth Circuit in Fulmer and the Second Circuit in Adams v. Department of Juvenile Justice. The city then compensates the single-role personnel for each hour work through 40 at that rate it has calculated, and then the employee is compensated at at least 1.5 times that rate for each hour over 40. Therefore, it complies with the FLSA. The class's reliance on 149 Madison is misplaced as the Supreme Court did not invalidate the formula that was used in that case. Rather, the Supreme Court found that there was evidence the formula was not actually being used to calculate the employee's overtime rate. Here, the pay records show that not only does the city's formula rely on the actual facts that have been developed in the collective bargaining agreement with its union, but that it actually employs the formula. 149 Madison should not affect this court's decision. As to the fire medics, they are assigned to work shifts on both ambulances and fire suppression vehicles. There are not two types of fire medics employed by the city, fire medics only employed on ambulances and fire medics only employed on fire suppression vehicles. The fire medics move between ambulances and suppression vehicles, sometimes within the same shift. Not a single pay period has gone by where a fire medic has not worked on both types of apparatus. When on a suppression vehicle, they serve as a single-role firefighter in the suppression of fires. When staffed on an ambulance, they still have the responsibility to assist with fire suppression, whether by connecting hoses, throwing ladders, or providing suppression-related medical treatment, which this court held in Lange was also part of fire suppression. So what is the significance of the stipulation regarding the six-month period during which I think the parties have agreed or stipulated that they were Right. So there were two reasons that we agreed to that stipulation. The first was to limit the damages portion of the damages calculation to only that six-month period. The classes council recognized that this did not go beyond a six-month period for further lending support to the forward looking justification that the 11th and 5th circuits justified. The second was to show that, yes, it is true that they had been assigned primarily to ambulances, but it's also true that they were detailed away from those assignments as shown by the unrefuted time records in this case, which show that not a single pay period went by without every single fire medic in the class working on both a suppression vehicle, traditional suppression vehicle, and an ambulance. And so that was the intent behind the stipulation, not that they only worked on an ambulance for six months. I'd like to move to the static single role. The Supreme Court has said that the regular rate is calculated by looking at the actual facts that the parties have agreed to. And the actual facts in this are that the annual salary for a single role EMT or paramedic is intended to compensate for 108.5 24-hour shifts in the year. That is one shift every three days, which is 122 minus 13.5 end days or non-paid days that they receive every year. That is 2,604 hours. 20 of those are to be considered at street time hours and 524 of them are scheduled overtime hours. Can I ask you, so I just want to, there's a preliminary issue before we get to any of this, which is that this report simply did not calculate the weekly rate, I think correctly, or the regular pay rate. It based it off the annual and didn't account for the 48 versus 72 hours. And when you account for that, it totally changes the calculation. And I'm adopting the circus approach in the unpublished opinion, but you get a completely different number with the fifth circus approach. I understand. And your honor, we do believe that we comply with 778113B. That calculation is on page 10 of the city's brief, which says that, which does follow what to come up with a weekly rate. And then because there are the 2,866 hours that are intended to be compensated for, it also divides those by 52 coming out with an average of 55.12 hours in a work week. If that approach, when you average it out, so here's the problem. When you average it out, it doesn't work. I mean, at least there's people much smarter than me making this calculation, but if you, if you divide it by 48 and 72, depending on the week, you get a totally different number and that the employees were deprived of overtime. So what I'm telling you is if you adopt the fifth circuit approach, you get one number. And if you adopt the fourth circuit approach, you get a different number. And I'm trying to figure out which one is right. Well, the, the, what the city does is exactly what the fourth circuit did in taking the total number of hours, which was 3,328, multiply the scheduled overtime hours, which were 832 by 1.5, which is 1248. Add that to the 2080 and you come up with the 3,328. You then divide the yearly salary by the 3,328. And that's how they came up with the regular rate. That is the salary for the hours that are intended to be compensated for the year. Did, let me, let me ask you a slightly different question. Did the annual salary get reduced in order to meet this, to make it budget neutral for these, for these firefighters? I'm sorry. I don't, I don't recall off the top of my head what was in the 2012 through 2015 collective bargaining agreement. I do know that the hourly rate for static employees did go down. So I assume that the, that the yearly annual salary went down, but that's approved of it in Youngerman Reynolds, which said that, that parties can agree to any compensation at any time. And, and this was a bonafide rate change, one that was agreed upon with the collective bargaining unit of all of the employees in this case. The pay advices that the, that are located in the appendix at 767 through 7072 shows that the hourly rate that the city uses, calculates in accordance with 778113B was used to pay, in this case, Mr. Zimmerly as the exemplar plaintiff for the first 40 hours that he, he worked. And then he was paid at a premium rate, which was actually more than 1.5 times his base hourly rate in order to compensate Mr. Zimmerly for all hours over 40. I'd like to point out that the rate does not fluctuate as the class alleges that it does in according to the, according to the overtime work. There is a, I believe a two cent difference, but that's because there are some non-discretionary bonuses that need to be included. And that's actually why the, the overtime rate is more than 1.5 times the regular rate that's calculated. As far as 149 Madison goes, the Supreme Court, the collective bargaining agreement that was entered into between the hourly wage was to be derived. The Supreme Court did not invalidate the formula that was agreed upon by the parties in that case. Instead, they say that there was evidence that the formula was not actually being used, that some hours were always compensated as overtime without having actually worked over 40 hours in a workweek. But that's not true in this case because the pay that he was paid at the approved formula rate for all hours through 40 and then was paid at the overtime rate only once he worked in excess of those 40 hours. So it does matter how many hours Mr. Zimmerly worked. He didn't get, he doesn't get the overtime rate until he gets to budget neutrality should not be a determiner, should not be a determiner that the, that the city has retaliated or violated the FLSA in this case. Because again, Walling versus Youngerman Reynolds says that an employer and employee are able to establish the regular rate at any point in any manner they say they see fit. The 11th circuit echoed that sentiment in Allen. The second circuit echoed that in Adams. Here there are no allegations that the city engaged in bad faith negotiations with the union. In fact, if you know local 42, there's no such thing as bad faith negotiations. They are a very powerful union. They're not simply going to roll over because the city asked them to. And so, and so this is the product of a bona fide rate change and not done in retaliation or in order to circumvent the city's obligations under the FLSA, which it complies with by paying the regular rate through 40 hours and the overtime rate in excess of those 40 hours. Well, it is a bit difficult to describe it as not a response to the homesteading decision. So you go and you convince the court that you've been denied overtime. Then when you go and renegotiate, suddenly you see what looks like a manipulation of your hourly rate so that you can just get paid the same, but at a lower rate to take into account for the overtime. Well, Judge Kelly, to address that point, I would say that absolutely the application of the formula is as a response to the Hermsen decision because we had to enter into a side letter agreement because of the Hermsen decision in order to come into compliance with the FLSA. But I would say that it's not retaliation if retaliation even is a part of this case, which the city argues that it's not. But it is not a scheme to circumvent the FLSA because the city does pay the regular rate through 40 hours and it does pay time and a half, sometimes in excess of time and a half for every hour that is worked over 40. Do the employees know how many hours of overtime they will be working? Is that sort of set into their work schedule or is that something that varies? No. And please forgive me, we have completely changed static single roles. They now work on what's called a Pittman schedule, which is a 12-hour schedule. So this does not even apply going forward. This is simply a retroactive case. But at the time of the facts of this case, they worked in every third day schedule. So some weeks would be 72 hours scheduled, some weeks would be 48 hours scheduled. And then they were also compensated with 13.5 end days or non-paid days. Those happen once every ninth shift. So there is no increase of pay, of duty, not any overtime during those weeks. So it is a set schedule. On my Outlook calendar, it has A shift, B shift, C shift, A shift, B shift, C shift. And so they always know that they are working ambulance five on A shift. Yes. If there are no other questions on the static single role portion of the case, I'd like to move on to the fire medic portion. Of course, 207K grants a partial exemption for those individuals that are engaged in fire protection activity. 201Y defines what is meant by those engaged in fire protection activity and includes paramedics, EMTs, rescue workers, and ambulance personnel. The individual must be trained in fire suppression, have the legal authority and responsibility to engage in fire suppression, be employed by a municipality, and engage in the extinguishment of fires or responding to emergency situations. Here, all of those are not an issue as the fire medics for the city go through the same training academy as a single role firefighter. They have the legal authority to put out fires. They are employed by the city of Kansas City, which is a municipality. And whether they're on a suppression vehicle or on an ambulance, they're always responding to an emergency situation where life or property is at risk. The only question then is whether they have the responsibility to engage in fire suppression. And this circuit, I believe, should follow the holdings of the 5th and 11th Circuit in McGavock and Huff and adopt a forward-looking affirmative duty or obligation to engage in fire suppression as the standard for whether a fire medic has the responsibility to engage in fire suppression. Council, I wanted to ask you about that because I'm not sure we have to. And that gets back to Judge Kelly's question about what's in this case. And in particular, the warm zone. If the warm, in my opinion, if the warm zone is not in dispute, that these employees, these paramedics had to deploy in the warm zone and pass ladders and train their hose, then I think that it doesn't matter. They had a present duty to do it too. But maybe I'm wrong. I want to know what's in dispute and what's the answer to that. No, I agree with that, Your Honor. I believe that not only do these employees have a forward-looking responsibility and sometimes only as forward-looking as the second half of their shift or their next shift, but I do believe that they have a present duty to engage in fire suppression. If they were not active in the warm those are duties that would be assigned to a single-role firefighter and not to a paramedic who is employed solely for their medical knowledge and treatment. And so I agree with Your Honor's conclusion that they have a present duty when at the scene of a fire to assist in the suppression of fires. Is there any dispute about that in terms of the warm zone? I mean, he's, look at the stipulation. It doesn't include anything about the warm zone. What's your best response to what opposing counsel says? It is that those material facts that the city put forward via affidavit were not denied by any evidence in the record and therefore should be admitted. I do not believe that there is any dispute that fire medics, even when serving on an ambulance, are active in the warm zone engaging in those activities. There's no deposition testimony to the contrary. There's no contrary affidavits that say that, no, not me, I don't participate in the warm zone. And so I believe that you need to treat those as unrebutted material facts. If there are no further questions, the city would urge the court to uphold both decisions of district court and affirm the decision. Thank you. Thank you. Rebuttal. I had to unmute myself. Thank you, Your Honor. I'm going to start with the first issue. You heard opposing counsel say that the overtime calculation has to be based on, or the propriety of it has to be based on actual facts. More than that, the Supreme Court has said since the very least, the city concedes that it has failed to use the actual hours worked. This is not like the Fullmer case from the Fourth Circuit. In the Fullmer case, Fullmer was not in response to a violation of the Fair Labor Standards Act. Fullmer was a free calculation of a salary, and it wasn't like the calculation that the city had here. They also pointed to the Youngerman Reynolds case from 1945. That again was, yes, parties are free to contract to set the regular rate of pay, but that's not what happened here. This was in response to a decision holding that the city was violating this by not paying overtime at all. In fact, as she conceded, mathematically, you have to reduce the hourly rate of pay in order to achieve the city's result of having the same rate of pay as they did when they were found to not be paying overtime. This notion about the 149 Madison, the Second Circuit in 149 Madison, which we quote in detail, held that exactly, exactly this scheme was unlawful. The Supreme Court was affirming the Second Circuit, and in addition to the Second Circuit's reasons, the Supreme Court gave other reasons, but that doesn't mean that it was holding that the reasons the Second Circuit held were invalid. And again, the city had no response to the Tenth Circuit case from 1945 as the court to reverse and grant judgment to plaintiffs on both claims. Thank you, and thank you to both counsel for your arguments this afternoon. We appreciate your willingness to appear by video, and we will take the matter under advisement.